UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

DONNA S. JOHNSON,
PLAINTIFF

VS.

MICHAEL ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,
DEFENDANT

CASE NO. 08-CV-525
(SPIEGEL, J.)
(HOGAN, M.J.)

## REPORT AND RECOMMENDATION

Plaintiff filed her application for disability income benefits in May, 2004. Her application was denied, both initially and upon reconsideration. She then requested and obtained a hearing before an Administrative Law Judge (ALJ) in February, 2007 at Dayton, Ohio. Plaintiff, who was represented by counsel at the hearing, testified as did Dr.Vanessa Harris, the Vocational Expert (VE) and Dr. Richard Hutson, the Medical Expert (ME). The ALJ reached an unfavorable decision in December, 2007 and Plaintiff then sought review by the Appeals Council. In June, 2008, the Appeals Council refused review and in August, 2008, Plaintiff filed her Complaint seeking judicial review of the final order of the Social Security Administration.

## STATEMENTS OF ERROR

Plaintiff frames the question on appeal or review in terms of "Issues Presented," rather than "Statements of Error." We interpret this as asserting that the ALJ erred in his residual functional capacity assessment and that substantial evidence supports a disability finding.

## PLAINTIFF"S TESTIMONY AT THE HEARING

Plaintiff testified that she was divorced and lived in a house with her oldest daughter.

She testified that she was right-handed and weighed 189 lbs. She is a licensed driver and uses the car to drive to therapy and doctor's appointments. She has an income from disability payments in the amount of $1,248 per month, but has not worked since June, 1994 at her job as a quality operator, a machine operator at a General Motors factory. When asked why she was unable to work, Plaintiff said that she was unable to walk or stand for long periods of time due to problems with her left knee.

Plaintiff related that she has had 4 surgeries on her left knee, the first of which was in 1993 and the last in 2001. She has had physical therapy and cortisone and senva injections without any significant benefit. She has worn a knee brace, but does not currently wear it. She sees Dr. Frank Noyes, who performed two of her surgeries, Dr. Frank Fasano, orthopaedic surgeons, and Dr. Gupta, a pain specialist. Plaintiff also referred to constant low back pain, for which she had received injections, that provided only short-term relief. She has also worn a back brace.

She has had two surgeries on her back, one in 2004 and the other in 2006. Dr. Theodore Bernstein, a neurosurgeon, performed her back surgery, but Dr. Jamal Taha did the follow-up. She sees Dr. Gupta, a pain specialist, on a monthly basis for pain and he has prescribed a Duragesic patch and Vicodin, extra strength, medications which "help somewhat." She identified Drs. Anil Agarwal and David Page as her primary care physicians. She also takes Neurontin for nerve pain and Effexor for depression and anxiety.

Plaintiff testified that she sleeps for 4-5 hours per night and can walk for 10-15 minutes at a time, stand for approximately 10 minutes and sit for 20 minutes. She is able to do some cooking, but does not drink or smoke, wash dishes, sweep or mop, vacuum, make beds or dust. She uses a computer, attends church on occasion, watches television and exercises three times per day, but doesn't eat, date or do yard work. She was able to take a five-day Florida vacation with her daughter last year and ride in a van driven by another to get to and from Florida. (Tr. 714-738).

# THE MEDICAL EXPERT

Richard Hutson, M.D., an orthopaedic surgeon, testified that Plaintiff has had several surgeries on her left knee, that Dr. Paul Nitz performed the first and Dr. Fasano performed the second. The initial surgery involved the taking of bone and the insertion of bone plugs. Dr. Hutson said that Plaintiff has "bone on bone osteoarthritis of the left knee and Grade IV chrondromalacia." She also underwent disc removal (L5-S1) surgery by Dr. Bernstein in November, 2004, but "she does not have appropriate loss of neurological function in her lower extremities to either meet or equal Listing 1.04. An MRI of the cervical spine in January, 2007 showed "degenerative disc disease at C5-6 and C6-7 and facet degenerative changes at L4-5 and L5-S1. There was no nerve root compression. "She definitely has vertebrogenic disorder in the lumbar spine, but she does not meet or equal Listing 1.04. She "ambulates rather well" without any assistive device. Plaintiff has "some loss of sensation at L5-S1 and some giveaway weakness," but has nothing consistent with a focal motor weakness of the left side and left lower extremity. Dr. Hutson also expressed the opinion that Plaintiff did not meet Listing 1.02 either.

Dr. Hutson found no evidence of non-compliance, but expressed the opinion that Plaintiff could perform, on a sustained basis, a sedentary job with a sit/stand option. She could elevate her knee periodically on a foot stool. (Tr. 738-747).

# THE VOCATIONAL EXPERT AND THE HYPOTHETICAL QUESTION

The first hypothetical asked the VE to assume Plaintiff was capable of work at the light exertional level, in a temperature-controlled environment, with the ability to alternate positions, no left foot controls and no squatting, limited to low stress jobs with no fast pace or production quotas and no extended periods of concentration. The VE responded that Plaintiff could not perform her past relevant work, but she could perform the jobs of boxed ceiling inspector, small products assembler and garment sorter at the light exertional level and the jobs of addresser, table worker and nut sorter at the sedentary level. The VE stated that there would be a representative number of jobs in the national economy at both exertional levels.

The second hypothetical came from the opinion of the family doctor that Plaintiff could stand and walk less than one hour in a workday, sit less than one hour and not lift at all. The VE responded that if those criteria were met, Plaintiff would be relegated to part-time work.

Counsel's question on cross-examination was to what extent elevation of the knee, in conformity with the testimony of the medical expert, Dr. Hutson, would preclude employment. The VE responded that if the elevation were to be of "hip level" or "waist level," that employers would not tolerate that height for safety reasons, but employers would tolerate the use of a footstool. (Tr. 747-758).

## THE ADMINISTRATIVE LAW JUDGE'S DECISION

The ALJ found that Plaintiff had various impairments: (1) lumbar degenerative disc disease with residuals of surgery, (2) left knee degenerative joint disease with residuals of surgery, (3) obesity, (4) cervical disc disease and (5) depression and anxiety. The ALJ found that all impairments were severe. The ALJ found that Plaintiff had the residual functional capacity to perform work at the light exertional capacity in accordance with his first hypothetical question. Ultimately, the ALJ found that Plaintiff was not disabled and unable to share in the Social Security fund.

## THE MEDICAL RECORD

Plaintiff's left knee was the subject of arthroscopic surgery by Dr. Fasano in October, 1999. Dr. Fasano indicated that Plaintiff had previous arthroscopy in December, 1993 and had sustained an injury to the medial femoral condyl with pain, popping and catching. This time Dr. Fasano placed three osteochondral cartilage grafts at Sycamore Hospital. (Tr. 173-174). In June, 2000, Plaintiff had an additional surgical procedure by Dr. Noyes as a result of "patellofemoral arthrosis." Dr. Noyes related that after Plaintiff's first surgery, she had physical therapy and was prescribed anti-inflammatories, but complained of persistent pain. A presurgical MRI showed "osteochondrosis involving the patella and trochlear groove with plica located over the

retropatellar fat pad." Dr. Noyes performed "scar revision, lateral retinacular release, chrondroplasy and major synovectomy" at Jewish Hospital in Cincinnati. (Tr. 177-182). Plaintiff then underwent a course of physical therapy at Healthsouth consisting of therapeutic exercises, electric stimulation and cold packs. The goals seemed to be to reduce pain and swelling, reduce fatigue, strengthen the quadraceps muscles and to increase balance. (Tr. 183-308).

In May, 2000, Dr. Page's diagnosis was "chrondral lesion medial femoral condyle - old bucket handle tear - derangement of meniscus." (Tr. 320-321). In July, 2000, Dr. Fasano described Plaintiff as having a "slight limp." (Tr. 325). Dr. Fasano indicated that Plaintiff's response to medications, therapy and surgery was "poor" (Tr. 326).

Because of "persistent symptoms in the left leg suggestive of sympathetically mediated pain," a lumbar sympathetic block of Nesacaine and Marcaine was administered by Leslie Gunzenhaeuser, M.D. at Christ Hospital in October, 2000. On October 11, 2000, Plaintiff had a left L-3 lumbar sympathetic block, on October 4, 2000, a lumbar sympathetic block left leg, and on September 18, 2000 a left lumbar sympathetic block. (Tr. 334-338).

In November, 2000, Dr. Noyes reported that after surgery on June 26, 2000, Plaintiff continued to have "extensive medial femoral condyle arthritic pain." All conservative options have been exhausted and she is not a candidate for a total knee replacement because of her age. The only available option is a Carticel procedure. She received a Cortisone injection on October 19, 2000 and a Synvisc injection on October 10, 2000. (Tr. 348-357).

An MRI of the left knee was performed in May, 2000. The results showed "Grade IV chondromalacia of the medial femoral condyle, high-grade chondromalacia at the donor site in the lateral facet of the trochlear of lateral femoral condyle and degenerative osteoarthritis of the patellofemoral joint with minimal medial subluxation of patella." (Tr. 358-359).

A Physical Residual Functional Capacity Assessment was completed by Myung Cho, M.D. in September, 2000. Dr. Cho, whose opinion was affirmed by Michael Stock, M.D., opined that Plaintiff had the residual functional capacity to lift 20 lbs. occasionally and 10 lbs. frequently, stand/walk for 2 hours in a workday and sit about 6 hours in a workday. Dr. Cho further opined that Plaintiff had a limited ability to push/pull with the lower extremities and

could occasionally balance, kneel, crouch and climb ramps or stairs, but should never climb ladders, ropes or scaffolds or crawl. (Tr. 362-369).

Gary Kraus, M.D., a neurosurgeon, saw Plaintiff in November, 2003 for "chronic low back pain." An MRI of the lumbar spine, taken in September, 2003 showed "mild spinal canal stenosis at L4-5 with diffuse bulging and hypertrophic ligamenta flavium. There was also some degenerative osteoarthritis and some desiccation of the disc space." Dr. Kraus recommended an SI joint injection and no surgical intervention. (Tr. 384)

Plaintiff was treated in the Emergency Room of Sycamore Hospital in Miamisburg, Ohio for low back pain in July, 2004. Lumbar spinal x-rays were taken then and the results were normal. (Tr. 398-406). She was later seen at the Kettering Medical Center in September, 2004 for low back and left leg pain. Lumbar myelography "demonstrated a widely patent thecal sac at all levels, a small anterior extradural defect at L4-5 and a large leftward defect visible at the L-5 pedicle level. There is degenerative disc disease at L5-S1." A CT scan, also in September, 2004, showed a "large extruded and superiorly migrated disc herniation that originated from L5-S1 and migrated superiorly in the left lateral recess. It is impinging the left L-5 and most likely the L-4 roots as well. This disc herniatuion is not visible on the MRI from June 26, 2004. At the time, there was only a much smaller central disc herniation at L5-S1." A surgical removal of the calcified disc material and left lumbar laminectomy with cage stabilization was done in November, 2004 by Dr. Bernstein. (Tr. 420-433).

Plaintiff fell in February, 2004 and afterward experienced neck pain. Dr. Page, her internist, referred her to Harold Stahl, an osteopath, who took cervical spine x-rays and concluded that Plaintiff had a "reversal on the cervical lordotic curve, narrowing of the disc space at C5-6 and some degenerative findings involving the uncovertebral joints at C5-6." (Tr. 484).

Plaintiff was evaluated by Loraine Glaser, M.D., for back and knee pain, which radiates down both legs with the left being worse than the right. She reported that an MRI, performed in October, 2004, showed a disc herniation at L5-S1 and that a subsequent laminectomy and cage stabilization by Dr. Bernstein did not relieve her low back pain. She also reported that she had 4 or 5 surgeries on her left knee, the most recent by Dr. Noyes, and that she needed a knee replacement. Dr. Glaser observed that Plaintiff walked with a normal gait, had normal range of

motion in the cervical spine and demonstrated no evidence of paravertebral muscle spasm or tenderness. Lateral motion of the spine was normal, but Plaintiff had difficulty bending forward. The neurological examination was normal. There was no muscle weakness or atrophy. She could stand on one leg and walk heel to toe. Straight leg raising is diminished on the left. There was a normal range of motion in the knees with bilateral crepitus, but no instability. Dr. Glaser's diagnosis included "low back pain S/P laminectomy, L5-S1 and degenerative joint disease, left knee." Dr. Glaser's conclusion was that Plaintiff could perform a moderate amount of sitting, ambulating, standing, bending, kneeling, pushing, pulling, lifting and carrying heavy objects and was capable of performing sedentary work. (Tr. 498-505).

A Physical Residual Functional Capacity Assessment was completed in February, 2005 by Robert Norris, M.D., who said that Plaintiff could lift 50 lbs. occasionally and 25 lbs. frequently, could stand/walk about 2 hours in a workday and sit for about 6 hours. Dr. Norris indicated that a total knee replacement was not indicated from the records, that Plaintiff had a full range of motion in the knees and used no ambulatory aid. (Tr. 506- 513).

Plaintiff was referred by Dr. Page, her internist, to Mark Reynolds, M.D., whom we assume to be a psychiatrist. (Tr. 514-518). Dr. Reynolds diagnosed Plaintiff with Major Depression. Dr. Reynolds mentioned spousal abuse, divorce and Plaintiff's physical problems as stressors.

A Physical Therapy Assessment was completed by Heidi Clarke at Sycamore Hospital for Dr. Noyes in April, 2005. Ms. Clarke noted that Plaintiff had a" lumbar laminectomy in November, 2005 for a herniated nucleus pulposus of L4-5 and L5-S1 and a long history of left knee problems, including four previous surgeries for cleaning out cartilage and the insertion and revision of bone plugs. Her left leg symptoms have increased since the back surgery." Plaintiff was able to ambulate without an assistive device and has full extension of the left knee, but flexion on the left was somewhat limited. There is normal sensation, but the quadriceps and hamstrings on the left are not as strong as the right. There was some swelling around the left kneecap. Ms. Clarke concluded by commenting that "This patient's symptoms are consistent with osteoarthritis of the knee and chondromalacia patella." (Tr. 524-526).

In a related assessment for Plaintiff's low back pain in March, 2005, Ms. Clarke noted

that Plaintiff's back pain had improved since the surgery. Her problems were decreased trunk mobility, slight postural changes in the lumbar region, low back pain radiating to the left leg and left leg weakness. An exercise program was pursued. (Tr. 533-534).

In May, 2005, Plaintiff had a post-myelogram CT of the lumbar spine. The scan showed "post-surgical changes at L5-S1, but no residual or recurrent disc herniation and no central or exiting nerve root compromise." (Tr. 541).

In May, 2005, Dr. Noyes completed a Physical Capacities Evaluation in which he opined that Plaintiff could sit for 20 minutes without pain and stand/walk for less than 1 hour. Dr. Noyes said that she could not use her left foot for repetitive movements and should never climb, balance, stoop, kneel, crouch or crawl or lift more than 10 lbs. She could occasionally lift up to a 10 lb. limit. Dr. Noyes stated that Plaintiff has pain and that there is a medical basis for her pain. He felt Plaintiff's pain was disabling, even for sedentary jobs and further felt that Plaintiff's pain would prevent her from performing tasks in a timely manner and that her attention/concentration deficit was "severe." (Tr. 551-553). In April, 2004, Dr. Noyes diagnosed Plaintiff with "medial tibiofemoral compartment arthrosis and associated patellofemoral arthrosis." No surgery was indicated at the time, but a total knee replacement was on the distant horizon. Voltaren was prescribed along with steroid injections. (Tr. 554).

Daniel Braunlin, M.D., reported in May, 2005 that Plaintiff completed nine physical therapy sessions for her low back and left leg in April, 2005 and that therapy was discontinued because it made Plaintiff's pain worse. Dr. Noyes re-injected her left knee and prescribed orthotics for her shoes. A "follow-up myelogram and CT scan in May, 2005 showed some incomplete filling of the S-1 nerve root bilaterally." Plaintiff displayed tenderness over the lumbar paraspinals from L-5 through S-1 bilaterally, markedly limited lumbar motion, decreased sensation in the left L-5 and S-1 sensory dermatomes and giveaway weakness in the left leg." An EMG showed "evidence of a mild, chronic left S-1 radiculopathy." (Tr. 555-557).

Dr. Bernstein reported to Dr. Agarwal in November, 2005 that Plaintiff was taking Vicodin for pain and that he couldn't explain Plaintiff's continuing radiating pain which was going down the left leg and, occasionally, the right leg. (Tr. 560). In May, 2005, Dr. Bernstein concluded that the severity of Plaintiff's symptoms were "out of proportion to her physical

findings." (Tr. 567). In December, 2004, Dr. Bernstein reported that Plaintiff had undergone "a left minimally invasive microdiscectomy done at L5-S1" and that he had prescribed a back brace. (Tr. 570). In September, 2004, Dr. Bernstrin suggested the surgery, based on a myleogram, which showed "a very large extruded disc fragment at L5-S1 on the left, which certainly explains her symptoms." (Tr. 571).

Dr. Agrawal completed a Physical Capacities Evaluation of Plaintiff in May, 2005. Dr. Agrawal said that his patient could sit for less than 1 hour and stand/walk for less than 1 hour. Her use of her hands was unlimited, except that she should not push nor pull. She should not use either or both feet for repetitive movements, could occasionally balance and reach above shoulder level, but should never climb, stoop, kneel, crouch, crawl or lift/carry 5 lbs. In addition, she should never work at unprotected heights or around moving machinery, be exposed to marked changes in temperature or humidity or operate an automobile. Dr. Agarwal opined that Plaintiff suffered from pain, that there was a medical basis for the pain and that her level of pain would prevent her from working at even a sedentary job because of deficiencies in attention and concentration that he considered "severe." Dr. Agarwal then rated as "moderately limited" every deficit category under the titles of understanding and memory, sustained concentration and persistence, social interaction and adaptation. (Tr. 274-278).

David Page, M.D., completed a similar evaluation of Plaintiff, also in May, 2005. Dr. Page agreed with Dr. Agarwal on every single point. (Tr. 579-581). In November, 2005, Dr. Agarwal indicated that Plaintiff could return to work in December, 2005. (Tr. 588).

A CT of the spine in April, 2006 demonstrated "annular degeneration posterolaterally at L3-L4, posteriorly and perhaps left posterolaterally at L4-L5 and diffusely at L5-S1 as described with no definite central or exiting nerve root compromise identified." (Tr. 595). An MRI of the lumbar spine in January, 2006, showed " early degenerative changes L3 through S1, but especially L4-5 and L5-S1 with micro-annular tear without extruded disc material. There is no significant central or foraminal encrouchment seen or nerve root compromize." (Tr. 596-597).

Plaintiff saw Suresh Gupta, M.D., a pain specialist, in 2006. Her chief complaint was low back pain, which radiated through the left hip and down the left leg. Dr. Gupta saw her on multiple occasions between February and November, 2006. Dr. Gupta noted that Plaintiff has had

9

four knee surgeries and a back surgery in 2004. Dr. Gupta recommended aquatic therapy and medications and Plaintiff followed that suggestion. with good results, except for occasional leg cramps. In April, 2006, Plaintiff underwent a diskography, a surgical procedure to "reveal the patient's pain generator." Plaintiff had epidural steroidal injection at L4-5 in February and in March, 2006. (Tr. 608-668 and 670-.679)

In September, 2006 Frank Fasano, M.D., an orthopaedic surgeon, saw Plaintiff for left knee "discomfort," a term some physicians use in lieu of various levels of pain. Dr. Fasano reported that Plaintiff has had multiple left knee surgeries, including arthroscopy, OATS procedure, chrondoplasty, lateral release synovectomy and a cartilage transplant. She has had surgery on her back and has had cortisone injections to both her knee and back. There was no swelling and Plaintiff had full extension of the knee and flexion to over 120 degrees. X-rays were taken and a diagnosis made of "left knee post-traumatic osteoarthritis." (Tr. 669).

In January, 2007, Plaintiff reported neck pain to Dr. Gupta, who observed normal motor strength and no evidence of sensory deficit. The diagnosis was "myofacial pain syndrome of the neck and head region." She fell in her driveway in December, 2006 and bruised her right hip and shoulder. The fall was caused by her leg and hip "giving out." She apparently was off work for a period of 6-8 weeks. (Tr. 680-694).

In February, 2007, Plaintiff had an MRI of the lumbar spine at Kettering Medical Center. The results showed "disk herniations at L4-5 and L5-S1. The larger is at L5-S1 and caused moderate thecal sac compression, but no definite focal root impingement. There was some left foraminal narrowing at L5-S1." (Tr. 694).

Jamal Taha, M.D. was consulted in January, 2006. Dr. Taha found that Plaintiff's problem was "degeneration of lumbar or lumbosacral invertebral disks at L5-S1 and L4-5." Dr. Taha considered fusion surgery as the treatment of last resort. (Tr. 695-699).

Keith Bidwell, M.D., a radiologist, conducted an MRI of the cervical spine in January, 2007. Dr. Bidwell determined that Plaintiff had "degenerative disc disease at C5-C6 and C6-C7 levels." (Tr. 700). An MRI of the lumbar spine showed "discogenic and facet disease at L4-5 aned L5-S1. Left foraminal stenosis is seen, but without root compression. There is also degenerative endplate marrow change at L5-S1 on the right," which is now Type II."

Dr. Taha completed a Physical Capacities Evaluation in March, 2007. Dr. Taha opined that Plaintiff could sit for less than 1 hour and stand/walk for less then 1 hour. She could use her hands for grasping, but not for either fine manipulation, pushing and pulling or repetitive movements. She should never lift 5 lbs. and never climb, balance, stoop, kneel, crouch or crawl, but she could occasionally reach above shoulder level. She would have a mild restriction of her ability to drive automotive equipment. (Tr. 704-705).

## OPINION

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for disability insurance benefits, plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. §§ 416(i), 423. Establishment of a disability is contingent upon two findings. First, plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, the impairments must render plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made

and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). Fourth, if the individual's impairments do not meet or equal those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

Plaintiff has the burden of establishing disability by a preponderance of the evidence. *Bloch v. Richardson*, 438 F.2d 1181 (6th Cir. 1971). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980); *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321 (6th Cir. 1978); *Phillips v. Harris*, 488 F. Supp. 1161 (W.D. Va. 1980). Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *see Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

The grid is designed for use when the alleged impairment manifests itself through limitations in meeting the strength requirements of jobs. 20 C.F.R. Subpart P, Appendix 2, § 200.00(e). If plaintiff suffers solely from nonexertional impairments, the grid is inapplicable and the Commissioner

must rely on other evidence to rebut plaintiff's prima facie case of disability. *Id.*, § 200.00(e)(1). Nonexertional impairments include "certain mental, sensory, [and] skin impairments" as well as "postural and manipulative limitations [and] environmental restrictions." 20 C.F.R. Subpart P, Appendix 2, § 200.00(e). Where a plaintiff suffers from an impairment or a combination of impairments that results in both exertional and nonexertional limitations, the grid is consulted to see if a finding of disability is directed based upon the strength limitations alone. If not, the grid is then used as a framework and the Commissioner examines whether the nonexertional limitations further diminish plaintiff's work capability and preclude any types of jobs. *Id.*, § 200.00(e)(2). If an individual suffers from a nonexertional impairment that restricts performance of a full range of work at the appropriate residual functional capacity level, the Commissioner may use the grid as a framework for a decision, but must rely on other evidence to carry his burden. *Abbott v. Sullivan*, 905 F.2d 918, 926-27 (6th Cir. 1990); *Damron v. Secretary of H.H.S.*, 778 F.2d 279, 282 (6th Cir. 1985); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 528-29 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). The existence of a minor nonexertional impairment is insufficient to preclude use of the grid for directing a decision. Rather, plaintiff must demonstrate that the nonexertional impairment "significantly limits" his ability to do a full range of work at the appropriate exertional level in order to preclude a grid based decision. *Atterberry v. Secretary of H.H.S.*, 871 F.2d 567, 572 (6th Cir. 1989); *Cole v. Secretary of H.H.S.*, 820 F.2d 768, 771-72 (6th Cir. 1987); *Kimbrough v. Secretary of H.H.S.*, 801 F.2d 794, 796 (6th Cir. 1986).

The assumptions contained in an ALJ's hypothetical question to a vocational expert must be supported by some evidence in the record. *Hardaway v. Secretary of H.H.S.*, 823 F.2d 922, 927-28 (6th Cir. 1987). A proper hypothetical question should accurately describe plaintiff "in all significant, relevant respects; for a response to a hypothetical question to constitute substantial evidence, each element of the hypothetical must accurately describe the claimant." *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). *See also Varley v. Secretary of H.H.S.*, 820 F.2d 777, 779 (6th Cir. 1987). Where the evidence supports plaintiff's allegations of pain, a response to a hypothetical question that omits any consideration of plaintiff's pain and its effects is of "little if any evidentiary value." *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975). However, "the ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals." *Stanley v. Secretary of H.H.S.*, 39 F.3d 115, 118

(6th Cir. 1994).

Pain alone, if the result of a medical impairment, may be severe enough to constitute disability. *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). In order to find plaintiff disabled on the basis of pain alone, the Commissioner must first determine whether there is objective medical evidence of an underlying medical condition. If there is, the Commissioner must then determine: (1) whether the objective medical evidence confirms the severity of pain alleged by plaintiff; or (2) whether the underlying medical impairment is severe enough that it can reasonably be expected to produce the allegedly disabling pain. *Duncan v. Secretary of H.H.S.*, 801 F.2d 847, 852-53 (6th Cir. 1986). *See also Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994); *Jones v. Secretary of H.H.S.*, 945 F.2d 1365, 1369 (6th Cir. 1991). This test, however, "does not require . . . 'objective evidence of the pain itself.'" *Duncan*, 801 F.2d at 853. Where a complaint of pain is not fully supported by objective medical findings, the Commissioner should consider the frequency and duration of pain, as well as other precipitating factors including the effect of the pain upon plaintiff's activities, the effect of plaintiff's medications and other treatments for pain, and the recorded observations of pain by plaintiff's physicians. *Felisky*, 35 F.3d at 1039-40.

Where the medical evidence is consistent, and supports plaintiff's complaints of the existence and severity of pain, the ALJ may not discredit plaintiff's testimony and deny benefits. *King v. Heckler*, 742 F.2d 968, 975 (6th Cir. 1984). Where, however, the medical evidence conflicts, and there is substantial evidence supporting and opposing a finding of disability, the Commissioner's resolution of the conflict will not be disturbed by the Court. *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983) (per curiam). In either event, the ALJ must articulate, on the record, his evaluation of the evidence and how it relates to the factors listed above. *Felisky*, 35 F.3d at 1039-41.

In light of the Commissioner's opportunity to observe the individual's demeanor, the Commissioner's credibility finding is entitled to deference and should not be discarded lightly. *Kirk*, 667 F.2d at 538. "If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky*, 35 F.3d at 1036. The ALJ's articulation of reasons for crediting or rejecting a claimant's testimony must be explicit and "is absolutely essential for meaningful appellate review." *Hurst v. Sec. of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985)(citing *Zblewski v. Schweiker*, 732

F.2d 75, 78 (7th Cir. 1984)).

A treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048, 1054 (6th Cir. 1983). A summary by an attending physician made over a period of time need not be accompanied by a description of the specific tests in order to be regarded as credible and substantial. *Cornett v. Califano*, No. C-1-78-433 (S.D. Ohio Feb. 7, 1979) (LEXIS, Genfed library, Dist. file). A physician's statement that plaintiff is disabled is not determinative of the ultimate issue. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984). The weight given a treating physician's opinion on the nature and severity of impairments depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record. 20 C.F.R. § 404.1527(d); *Harris v. Heckler*, 756 F.2d 431 (6th Cir. 1985). If not contradicted by any substantial evidence, a treating physician's medical opinions and diagnoses are afforded complete deference. *Harris*, 756 F.2d at 435. *See also Cohen v. Secretary of H.H.S.*, 964 F.2d 524, 528 (6th Cir. 1992). While the Commissioner may have expertise in some matters, this expertise cannot supplant the medical expert. *Hall v. Celebrezze*, 314 F.2d 686, 690 (6th Cir. 1963); *Lachey v. Secretary of H.H.S.*, 508 F. Supp. 726, 730 (S.D. Ohio 1981).

It is the Commissioner's function to resolve conflicts in the medical evidence and to determine issues of credibility. *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994); *Hardaway v. Secretary of H.H.S.*, 823 F.2d 922, 928 (6th Cir. 1987); *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). The Commissioner's determination must stand if it is supported by substantial evidence regardless of whether the reviewing court would resolve the conflicts in the evidence differently. *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). *See also Boyle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *Tyra v. Secretary of H.H.S.*, 896 F.2d 1024, 1028 (6th Cir. 1990). The Commissioner must state not only the evidence considered which supports the conclusion but must also give some indication of the evidence rejected in order to facilitate meaningful judicial review. *Hurst v. Secretary of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985). *See also Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).

If the Commissioner's decision is not supported by substantial evidence, the Court must decide

whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 111 S. Ct. 2157, 2163 (1991).

Where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the sequential evaluation may be continued. *DeGrande v. Secretary of H.H.S.*, 892 F.2d 1043 (6th Cir. Jan. 2, 1990) (unpublished, available on Westlaw). Remand is also appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). Remand ordered after a hearing on the merits and in connection with an entry of judgment does not require a finding that the Commissioner had good cause for failure to present evidence at the prior administrative hearing. *Faucher*, 17 F.3d at 173.

Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher*, 17 F.3d at 176. *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 782 (6th Cir. 1987). The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher*, 17 F.3d at 176. *See also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).

If the ALJ's residual functional capacity assessment is erroneous, it is highly likely that the VE's opinion is also erroneous, since the VE's opinion on the type and number of jobs available is dependent upon parameters established by the ALJ's hypothetical question. However, Plaintiff's counsel, taking no chances, asserts both that the ALJ's residual functional capacity assessment is too liberal and that his ultimate decision, adopting the VE's opinion, was not based on substantial evidence. We believe the first to have merit, but the second to lack merit.

The ALJ's residual functional capacity assessment was that Plaintiff could perform work at the light exertional level. That conclusion was based on the opinions of paper reviewers, Myung Cho,

M.D., whose opinion was affirmed by Michael Stock, M.D. and Robert Norris, M.D. and by Dr. Bernstein, the back surgeon. The opinions of the three paper reviewers and Dr. Bernstein are opposed by the views of the ME, Robert Hutson, M.D., who said that Plaintiff could perform sedentary work, by the opinion of Loraine Glaser, M.D., who said that Plaintiff could perform sedentary work, by Frank Noyes, M.D., Anil Agrawal, M.D. and Jamal Taha, M.D., who all opined that Plaintiff could not perform sedentary work. Dr. Hutson, it will be remembered, is the medical expert employed by the Social Security Administration. Dr. Glaser is an examining physician. Drs. Noyes, Agrawal and Taha are treating physicians.

Substantial evidence supports the proposition that Plaintiff is not able to perform the requirements of light work and that the ALJ's residual functional capacity assessment is erroneous. However, because the VE also found sedentary jobs that she believed Plaintiff could perform, the error may be harmless unless, as Plaintiff alleges, substantial evidence does not support the ALJ's ultimate conclusion that Plaintiff is able to perform sedentary work. In other words, whether or not Plaintiff is able to perform sedentary work is, at least, arguable. Her ability to perform light work, though arguable, is not supported by substantial evidence in our opinion.

Dr. Hutson, the ME and an orthopaedic surgeon, expressed the opinion that Plaintiff could perform sedentary work if she had the opportunity to elevate her left knee on a footstool and had a sit/stand option. Dr. Hutson made it clear that the use of a footstool, which would not allow Plaintiff to elevate her leg higher than her heart, but would allow her to elevate her leg, remove it from the footstool and move the knee back and forth, would be a necessary job accommodation. The cross-examination of the VE demonstrated that elevation of a leg to the hip or waist level would not be tolerated by employers, but the use of a foot stool would be tolerated.

Dr. Noyes based his opinion that Plaintiff was unable to perform the requirements of sedentary work on Plaintiff's ability to tolerate pain, which would prevent her from performing tasks in a timely manner and from being able to concentrate and attend. Dr. Arrawal expressed the same opinion, but added an additional reason, a inability to lift 5 lbs.. Dr. Taha based his opinion on an inability to lift even 5 lbs. Dr. Noyes, an orthopaedic surgeon, performed surgery on Plaintiff's knee, but expressed the opinion that she could lift 10 lbs. on occasion. Dr. Taha, a neurosurgeon, examined Plaintiff for her lumbar disc problem. Dr. Agrawal is a family practice physician.

17

The ALJ rejection of Dr. Noyes' opinion and Dr. Agrawal's opinion relative to Plaintiff's inability to concentrate is supported by Plaintiff's failure to testify about any inability to concentrate, plus her admission that any inability to concentrate was likely the result of pain medication and that she had failed to communicate this side-effect to the prescribing physician. The ALJ's rejection of Dr. Agrawal's and Dr. Taha's opinion relative to Plaintiff's inability to lift even 5 lbs. was consistent with the objective medical evidence. Thus, the ME's opinion was solicited to attempt to reconcile the competing opinions in the record. Dr. Hutson's opinion did just that and was the tie-breaker in resolving the dispute among the authorities over the exertional level of work that Plaintiff had the capacity to perform. The ALJ's reliance upon it was not erroneous in light of the conflicting evidence in the record.

When asked by the ALJ at the hearing why she was unable to work, Plaintiff said that she was unable to walk or stand for long periods of time due to problems with her left knee. She never mentioned either an inability to concentrate or low back pain so severe that she was concerned about lifting. She did, however, report to Dr. Reynolds, the psychiatrist from Bellbrook, Ohio, that she was experiencing an inability to concentrate, a fact Plaintiff attributed to the pain medications that she was taking.

There is no question that Plaintiff has impairments of her left knee and lower back which are the sources of some degree of pain. She has undergone multiple surgeries on her left knee and one surgery to her low back. She has undergone physical therapy, both of the land and aquatic variety, has endured Cortisone injections, worn a brace and taken medication. Yet she is able to walk with a normal or near normal gait, has slight muscle weakness, no atrophy, no instability and a relatively normal range of motion and no appreciable loss of sensation.

Her low back impairment, affecting two disc spaces, is also a legitimate source of pain as was confirmed by lumbar x-rays, MRIs and CT scans The back impairment appears to be getting worse and was certainly not helped by Plaintiff's falls in February, 2004 and December, 2006. She has limited trunk mobility, has endured nerve blocks, completed physical therapy, worn a back brace and orthodics and had a laminectomy with cage stabilization. Dr. Bernstein, the back surgeon, could not explain Plaintiff's report of radicular symptoms, since there was evidence of only mild radiculopathy and no motor weakness. Aquatic therapy at the direction of Dr. Gupta, the pain specialist, has

produced promising results.

The VE located three jobs at the sedentary level that she found Plaintiff was able to perform and that she could perform them with a sit/stand option and with the use of a foot stool to elevate her leg as needed. Since substantial evidence supports the conclusion that Plaintiff had the residual functional capacity to perform sedentary work and the VE located three jobs at that level which Plaintiff could perform, she is not disabled and the opinion of the ALJ should be affirmed.

Although we disagree that Plaintiff has the residual functional capacity to perform work at the light exertional level, we do agree that she can work at the sedentary level with a sit/stand option and the use of a foot stool. We find, therefore, that the ALJ's decision is supported by substantial evidence and should be affirmed.

**IT IS THEREFORE RECOMMENDED THAT:**

The decision of the Commissioner be AFFIRMED and this case be dismissed from the docket of the this Court.

Date: 12/3/09

Timothy S. Hogan
United States Magistrate Judge

# NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO THIS R&R

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten (14) days after being served with this Report and Recommendation. Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to thirteen (13) days (excluding intervening Saturdays, Sundays, and legal holidays) in the event this Report is served by mail, and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation are based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten (14) days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).

J:\HOGANTS\donnajohnson.wpd